The first case for argument is case number 20-1392, Southern Iowa, United States v. Reymundo Pacheco. Court will hear from Ms. Quick. Good afternoon. May it please the court. Mr. Yanez appeals the denial of his motion to suppress. Law enforcement stopped Mr. Yanez pursuant to a traffic violation and the legality of the traffic stop is uncontested. However, the officer extended the stop without the required reasonable suspicion of criminal activity. Alternatively, law enforcement lacked probable cause to search Mr. Yanez's vehicle. Turning to the first issue, after the warning was issued, the justification for the initial stop had concluded and the officer needed reasonable suspicion to extend the seizure. As a preliminary matter, the officer did not identify what criminal activity he was relying upon to justify the extended seizure. This court was previously critical of that in the Jones case. It illustrated that it was a mere hunch as opposed to reasonable articulable suspicion of criminal activity. And as the parties have discussed in the briefing, if it's drug trafficking, there is no reasonable suspicion of drug trafficking. The factors that the officer Shields relied on for the extension of the seizure was that Mr. Yanez appeared nervous. The car had a lived-in look. It was a one-way rental that Mr. Shields didn't think made sense for the trip that Mr. Yanez intended to take. And officer Shields indicated that Mr. Yanez attempted to control the conversation. Now, the case law is clear that a combination of innocent factors can't amount to reasonable suspicion. But looking at this circuit's case law and the case law of other circuits cited in our brief, courts are more critical when it is a combination of innocent factors, which is what we have here. Let me interrupt you. The other side, of course, directed our attention to the file a response to the 28J. But for argument purposes, the circumstances were materially distinguishable in the Soderman case. In those circumstances, first off, his license was suspended. So Mr. Soderman wasn't even legally driving. But there was, again, not all simply innocent factors. In those cases, in that circumstance, Mr. Soderman's story was fishy, is the way to put it. He stated that he was going to see his father. When law enforcement talked to his father, his father said, well, I wasn't expecting him. I think he indicated his father was terminally ill. And also, Mr. Soderman was known to have a history of drug trafficking. So while there are some similarities, it is materially distinguishable from the facts that we have here. And it's similar to the other cases that were cited by the district court in our There is something that tips the scales. There's something nefarious going on. Either they have inconsistent stories about their travel plans, the driver is caught in a lie and is inconsistent with what he's stating, or a factor similar to that. We don't have anything like that here. Ms. Quick, wasn't there a discrepancy about the length of his trip and the amount of time that had the car rented for? So there wasn't necessarily a discrepancy. There was an oddity. Mr. Officer Shields at the time believed that there wasn't enough time in the rental agreement for Mr. Llanes to go drive from California to Iowa, stay in Iowa for four to five days, and then drive home. That's not necessarily a discrepancy. That's just an oddity. Because as it was later found out, Mr. Llanes said his plan was to fly back home after visiting Iowa, which again might not be the norm, but it's not unheard of. And it's distinguishable from, you know, saying, like in other cases that cited in our brief, being inconsistent on where you're going or changing your story on where you're going. It seems kind of odd, but it's not being caught in a lie. Did the rental agreement reflect a drop-off in Iowa? It wasn't entered into evidence, Your Honor. But it was determined to be a one-way rental. Well, was there testimony about the rental agreement? There was some testimony about the rental agreement, yes, Your Honor. There was or was not? I'm sorry. There was testimony about the rental agreement, Your Honor. Didn't they? You answered very carefully saying the rental agreement wasn't there. What was the testimony about the rental agreement? The testimony about the rental agreement was that it was a one-way rental, I believe, but I'm not 100% sure on that. For a number of days? I'm sorry, go ahead. Did it mention the number of days? I don't believe so, Your Honor. But if it could just be, I'm not remembering it correctly. My recollection of Officer Shields' testimony was more conclusory, where it was just, it didn't add up from what Mr. Yanez was telling him. That much I'm confident on was that Officer Shields' assessment of the rental agreement. And one thing that was discussed in these circumstances that Officer Shields determined amounted to reasonable suspicion was that Mr. Yanez was attempting to control the conversation. How the traffic stop proceeded after, once he was Officer Shields to issue the warning for speeding and varying the speed. Officer Shields indicated that he felt Mr. Yanez was attempting to control the conversation. That conclusion only makes sense if the statements by Mr. Yanez are looked at in isolation. When reviewing the video of the actual conversation, both parties are very cordial and conversational. This isn't a situation where Mr. Yanez is trying to change the subject, Officer Shields is trying to ask questions, and Mr. Yanez is trying to divert the conversation to something else. There are significant periods of no talking between the two. Everything Mr. Yanez states is either something in response to a question from Officer Shields, either asking him about his travel plans, about his life, his job, where he's from. Mr. Yanez offered anecdotes that related to this conversation that Officer Shields initiated. So this isn't like a circumstance where Mr. Yanez was attempting to control the conversation to avoid any discussion about criminal activity. Counsel, you may get here, but what about nervousness? And the reason why I'm asking this is because it mentioned fluttering of the stomach, which would indicate maybe some response to that particular factor. So two things, Your Honor. I would note, first in general, nervousness is considered incredibly weak. When nervousness becomes more important is when it's nervous evasive behavior. And there's no indication and nothing I think argued or in the record that would indicate Mr. Yanez was being evasive. And as far as whether it's normal nervousness, the case cited in our brief, Salzano out of the Tenth Circuit, when discussing there the officer made a similar kind of finding that the driver there seemed especially nervous. And the circuit was, you know, critical of that and saying, well, you don't know this individual. How do you know what's normal nervousness for this person? I also think it's necessary to look at it based on the driver sitting in their driver's seat. Mr. Yanez was pulled back into the squad car. So if there is a little bit more nervousness than the typical traffic stop, I think it could easily be explained by that. On the Tenth Circuit case, though, we took a different view. I think in the Lee-Brown case or Leprin case, where we tried to distinguish back, we suggested that extreme nervousness could be a significant distinguishing factor that could create a reasonable suspicion. What do you think of that? So I don't know if I would characterize stomach fluttering as extreme nervousness. I guess I would first dispute that because I don't even know what stomach fluttering exactly would look like. It's hard for me to visualize what that even would be. But I don't know if that would rise to the level of extreme nervousness. And I don't think that Officer Shields believed that Mr. Yanez was extremely nervous. I don't want to put words into his mouth, but usually in these kinds of suppression hearings, when someone is overtly nervous, officers are clear to explicitly say so and assert it. There was a statement by the officer that he was nervous, and obviously that was a finding. But in general, I think it's an incredibly weak factor for this court to rely upon. At some point, though, your client consented to the search of the back seat. Do I have that right? Yes, Your Honor. So how long was the delay that you're challenging now? What's the period of delay? So the warning was issued, and then they stopped. That's when kind of the initial basis stopped. Law enforcement then deployed the drug dog. That was about two and a half minutes where Officer Shields was walking the dog around. And I don't think it was a very significant period of time when then Officer Shields came back and asked for consent to search. So it wasn't significant after the drug dog, and the drug dog was a few minutes. Do you want to address the probable cause to search the trunk? Yes, Your Honor. Alternatively, even if the court determines that the extension of the stop was reasonable, the evidence still must be excluded because there was not sufficient probable cause to search the vehicle. Again, these are all innocent factors that the court is relying upon to justify reasonable suspicion of, or excuse me, probable cause to search the vehicle. Things that seem odd, but again, could be explained by non-criminal conduct. It doesn't seem like there's a lot of luggage. There's the spare tire that's been moved. Again, odd, but combined, our position is it is insufficient to establish probable cause. Does the record establish whether the spare tire was a big spare tire or a small spare tire? Because you know there are two kinds of them. Yeah, I don't believe it does, Your Honor. You know, on the spare tire, just to follow up on that, you make a point that some of these are odd, but maybe they don't rise to the level of suspicious all by themselves. I got to say having a spare tire in your backseat and saying that the rental car company changed it and then put the spare tire in the backseat is downright suspicious. Why am I wrong about that? So I would agree that that is probably the strongest factor in the government's favor supporting the search, but again, it doesn't rise to the level of probable cause of drug trafficking. There are many reasons why a spare tire might not be where you think it's supposed to be. One of those is drug trafficking, but it could be a whole different list of things that in such a short encounter are possible. If there are no further questions, I would reserve the remainder of my time for rebuttal. Very well, thank you, Ms. Quick. Mr. Call? I think your microphone must be muted. It is, I apologize. May it please the court, Ms. Quick, I'd like to start by addressing the nervousness issue. The district court made a factual finding at page 12 of its order that the defendant was abnormally nervous. That's based on stomach fluttering, that's based on the failure to make eye contact, and that's a factual finding which we think this court must defer to. Ms. Quick mentioned that, or tried to distinguish the Soderman case saying, well, Soderman had a fishy story. Well, I would submit that the defendant in this case, Mr. Yanez Pacheco, also had a fishy story. It did not really add up. The story was that he was driving to see friends in a town in Iowa, the name of which he had difficulty remembering. He had to be prompted by the officer to remember that he was going to Marshalltown. He had already, the officer had observed the lack of luggage to lift and look in the car, the fact that the defendant had personal items there. So as we look at the whole circumstance, there was certainly reasonable suspicion. I want to talk and clarify a little bit about the rental agreement. The rental agreement, and I'm referring to page 32 of the suppression transcript, was observed on Mr. Yanez's phone. That's what Deputy Shields was looking at. He testified and the court specifically credited his testimony that the amount of time that the rental agreement indicated would be spent was not enough to be for the stated purpose of the trip, the four or five days to visit friends in Marshalltown. There's some reference to the fact that the defendant intended to fly back to California. As Ms. Quick points out in her brief, and the government would agree, that information was not developed until later in the stop until after Mr. Yanez had been arrested and was making a post-Miranda statement. That doesn't come up until about shortly after the two-hour mark on Defense Exhibit A. I did want to also point out... Was there any testimony about the rental agreement with respect to the drop-off place for the automobile? I don't think there was any testimony prior to the time that the defendant was placed under arrest. In that clip at about the two-hour and 37-second mark in the post-Miranda, there's some discussion that he was going to drop it off at a location on Floor Drive, which is near the Des Moines International Airport, but that was information that the deputy didn't have until well after he had made the decision to arrest the defendant. I'm a little suspicious, though, about the one-way trip and the timing. Just a couple of years ago, I took my kid up to college, and I was driving the family car, and he was driving the U-Haul. It was a one-way trip. We dropped off the U-Haul in Michigan, and I flew back. By itself, that doesn't seem very suspicious. Well, by itself, perhaps not, but the defendant in this case was saying that he was going to spend four to five days with friends. He didn't have enough luggage in the car to indicate that he'd really be staying that long. Again, as I mentioned, there's the lived-in look, there's the food items, that sort of thing, those sorts of indications that this court had. in the past and can take into account what those mean to the eye of a trained officer. I think, particularly in the context of traffic stops and the automobile exception, the court has given particular deference to officers' training and experience. That's mentioned, for example, in the Guevara case. Wouldn't the luggage, though, have been most naturally in the trunk, not in the back seat? I realize that some people put luggage in the back seat, but most of the time when I travel, I put my luggage in the trunk so that the luggage wouldn't have been visible to the officer. Well, there are two aspects where the luggage comes up in the discussion and in the officer's analysis. The first, when he first looks in the car, doesn't see luggage that would be consistent with that four or five-day trip. At that point, he would have not seen what was in the trunk. Then later, after the dog had alerted when we go to the consent search to the back of the car where the spare tire is observed, at that point, Mr. Yanez makes the specific statement, the officer says, where's all your luggage? And Mr. Yanez says something to the effect of the backpack is it and my plan to buy clothing when I got to Marshalltown, which, again, was a sort of nonsensical explanation and it was something that wasn't added to the probable cause. I agree with you that on the probable cause issue, the fact that by the time the officer knew that there was really just a backpack full of luggage, that was pretty suspicious. I was just more challenging on the front end that I don't know what's suspicious about not having enough luggage in the back seat of the car. That's what I was trying to figure out. Well, the officer indicated that and he indicated that, I believe, in his testimony and also in his report. I want to make just a clarification because as I was reading the brief, it may not be clearly cited. The officer's report came in as government exhibit one at the suppression hearing that's found at both docket entry 53-1 and 68-1. I think we mistakenly cited it at socket entry 67 at one point, so I wanted to clarify where that was and that has a little bit more detail than the deputy's testimony. A lot of the focus of the hearing had to do with whether the dog had alerted, whether the dog had been cued, issues that the district court found unnecessary to decide. I think the key point, key pieces of evidence are that dash cam and body cam video, which are as defense exhibits A and B and then government exhibit one together with the deputy's testimony. Mr. Call, what is a fluttering stomach? Is that a noise? Is that a movement? What is that? I took that to be a visual observation, although it is what it is in the record and I will acknowledge I did not handle this case below, so I didn't have any conversations with the deputy to pursue that. There's nothing in the record that would help with that? Well, he uses the term fluttering and I know that's an exhibit one at page three and it may be in the testimony, but I don't think anybody drilled down during the hearing as to what exactly he meant by that. Is it in the dictionary, counsel? I'm sure it is. No, I'm not sure it is. I meant to look, but forgot to. Go ahead. We can look. Put that together with the eyes darting and as I say, the district judge made the express finding that he was abnormally nervous. The government isn't arguing that the nervousness standing alone justified the reasonable suspicion. We're suggesting that the nervousness when added to the odd explanations of travel and things that just didn't quite add up created the reasonable suspicion to allow the deputy to extend the traffic stop. We accept that it was at that point that he ran the drug dog around that reasonable suspicion was required at that point. To answer Judge Brunder's question, it was about took about two minutes or two and a half minutes for the canine to be deployed and at that point, Deputy Shields returned the patrol car and asked for consent to search into the back to look into the back of the car, which led to the being the only luggage that Mr. Gannis had. Mr. Call, I assume you've watched the video, right? Yes. I have as well. I've watched a fair amount of it and I assume we're still even on a clear air standard of review, but what did you see that was particularly nervous? I noticed at least what I thought to be sort of a friendly conversation. They speak certainly at a cordial level. Now, the Deputy Shields took the conversation and the statements by Mr. Gannis as an attempt to control the conversation, which in his experience was a was a red flag. The record talks about two  there was a lot of shuddering of the stomach. It also talks about the defendant avoiding eye contact, which of course is not something that we can see on the video because it's because it's dark. I think those are the two key things. Later on there's an indication that the defendant is sort of smiling and giggling inappropriately. I think that really occurs around the time of the consent to the search when they returned back to the back to the car. Counsel, can you help me with, so I'll just be honest with you, the case that's one case of our court that I think is very close to this one and I know that the parties have have looked at and briefed it and that's the Beck case. The Beck case looks an awful lot like this case. Now, I just want to hear what the government's best argument is that the Beck case, which I think is a 1998 case, is not on point. I will admit Beck is not immediately coming to my mind. I was looking at some of the more recent cases like Soderman and Morello-Salgado, so I really, other than to make something up on the fly, I really don't have a good way to distinguish Beck for you. Fair enough. I can look at it myself. I was just, I just wanted to give you a chance to respond. I appreciate that. Is Beck in either of the briefs here? Counsel, I'm asking you. Perhaps not. It's 140 F 3rd 1129. Oh, I'm sorry. And I'm just going to say you need not answer. But thanks, thanks. I don't mean not to thank you. I'm grateful, but proceed. Essentially, the government believes this is a fairly garden variety traffic stop case that falls well within the heartland of decisions where this court has affirmed denials of motions to suppress. We'd ask that the trial court's denial of the motions to suppress be affirmed here, and unless there are further questions, I'd yield back my time. Seeing none, thank you, Mr. Call. Ms. Quick, your rebuttal, please. I want to start with looking at the extension of the stop, and one of the factors discussed in Mr. Call's argument, the lack of luggage. The only real statements, it's kind of offhand statement by Officer Shields is, well, I didn't see any luggage. I would note that it was dark outside. He was on the side of a highway, and again, couldn't see in the trunk. And when watching the video, it's get an indication that there is what he would believe is minimal luggage until he actually searches the back seat. You can kind of hear some surprise in Officer Shields' voice when he says, oh, a backpack. You just have a backpack or something to that effect. So it really wasn't until that point that there's really anything that can be meaningfully relied upon as far as the one way. Ms. Quick, is our review of this nervousness finding, is that for clear error? I believe it is, Your Honor. And I would note watching the video, there is some looking around, but nothing that seems overtly odd or suspicious for a lay person who has been put back in a patrol car. I think that's something that is really subject to just opinion. I think you could also say it's odd if someone was sitting in the patrol car looking straight ahead and not moving in any way, shape, or form. But nothing about his mannerisms or how he is reacting is inherently suspicious. And finally, going back to the discussion of the one way trip, I wanted to highlight the white case out of this circuit. And there, that one is cited in the brief. There was a little odd. And law enforcement saw the individual carrying the carry-on in what they believed was an odd manner. This court rejected that that was enough to detain someone. That didn't amount to reasonable suspicion. So again, I think it's inconsistent with the argument that we're putting forward. This commendation of oddities isn't sufficient to justify reasonable suspicion, to justify the extension of the traffic stop. Counsel, are you familiar with the Beck case? I figured out how we found it. It was cited by the government side in Lebron, which has a very extensive discussion of Beck. So I'm wondering if you're familiar with Beck and what your view on that is. Yes, I am familiar. Judge Benton is correct. It wasn't cited in our briefs. But I do think it, again, supports our case because it's, and I feel like odd. The, you know, rental cars, they think, oh wait, you see these a lot. Rental cars in general, officers say it makes them suspicious. Length of trips, things that might to a trained officer seem suspicious, but just aren't enough to rise to the level of reasonable articulable suspicion. It's more of a hunch. And I think that's what we have here. Of course, we have a great big difference in that case to the officer actually telling that we tell Beck at one point he was free to go. That I don't recall. I'm not as comfortable with the case to say one way or another. But I don't, I don't know saying free to go, how that would play into reasonable suspicion. I just must not. Well, then there's some consent after that. But, but, but anyhow, and of course you, counsel, being experienced know about 28J too. Yes. But thank you for your help. Thank you. Very well. Thank you, Mr. Call and Ms. Quick for your arguments and appearance today. We appreciate it. The case is submitted and will be decided in due course.